Gaston, Judge
dissented, and delivered the following opinion:—
I concur with the other members of the Court in the opinion, that the error assigned in this case, for that the presiding Judge, expressed or intimated an opinion to the jury upon the facts, is not sustained. The reasons stated by my brother Ruffin for overruling this objection, are so entirely satisfactory, that I have no wish to add a word to them. I am also of opinion, that the irregularities of the trial, urged as a reason for setting aside the verdict and granting a new trial, were addressed to the discretion of the presiding Judge, and that as a Court of Errors we have no jurisdiction to review the exercise of that discretion. But I do not concur with my brethern in the opinion that judgment of death has been rightfully awarded against the prisoner, because it seemeth to me, upon the record, that his guilt has not been ascertained by a trial in due course of law. Á verdict of guilty has been indeed received, and entered of record, but that verdict is so vitiated by the irregularities of the trial, also apparent on the record, as to render it in law bad. It is my opinion, therefore, that the Court below should be directed to vacate this verdict, and award a venire de novo.
To ^uphold the purity and efficiency of trial by jury, the law has prescribed certain regulations by which it shall be conducted. , And the law would be unfaithful to itself, if it did not take effectual means to insure the observance of its mandates. For this purpose, it of course renders amenable to punishment, all who violate these injunctions. But this vindictive sanction, although it may deter from violations of right, affords no redress to those who may, nevertheless, have been wronged. The law, therefore, requires of its ministers, whose duty it is to *517 pronounce sentence upon the matter set forth in the record, to see whether the disputed facts have been found in the mode which it authorises, and with the observances of the solemnities which it commands. If this be not so, and an injury may thereby have been sustained by him against whom judgment is prayed, the judgment cannot be pronounced, but it must be suspended until the facts be legally ascertained. . Should it appear on an inspection of the record, that the jury consisted of eleven instead of twelve persons — that the jury were not of the proper vicinage, or were returned by a wrong officer — that some of the jurors were not sworn — that proper challenges were refused — that in a capital case the jury had rendered a verdict against the prisoner secretly, or in his absence— that after the jury were sworn, either party delivered in a piece of evidence to the jury, and the verdict was given for him that delivered it — and that after the jury were sworn and gone from the box, they sent for a witness to repeat his evidence which he had before given openly in Court — in these, and in all cases like these, there cannot be judgment, but the verdict must beset aside and another trial awarded. See Arundel’s case, 6 Rep. 14. Co. Lit. 125, a. Hassel v. Payne, Cro. Eliz. 256. Norman v. Benmont, Willes, 484. Wray v. Thorn, Dev. 484. 2 Hale’s Pleas Crowns, 306, 307. Such of these matters as may be termed extrinsic in their nature, but which, nevertheless’, affect the legality of the trial, are to be made appear to the Court before whom the trial is had, and are there indorsed on the postea, or otherwise entered on the record. 2 Hale, ut supra.
There is a marked distinction between the awarding of a new venire because of the verdict being thus declared bad, and the setting of a verdict aside, and granting of a new trial. The former must be for matters apparent only on the record and is of right. The other may be for matter not appearing on the record and is addressed to the discretion of the Court. The forme'r is matter of error, and must be noticed by the appellate Court; the latter is ordinarily not matter of error, nor elsewhere examinable. The former is the ancient common law proceeding, the *518 latter is comparatively of modern invention. ' See explanation of Chief Justice Willis in Wytham v. Lewis, 1 Wilson, 55. See also 2 Hawkins, ch. 47, sect. 12. 1 Chitty, 654.
The irregularities of the trial in this case are thus stated: —“ After the evidence was closed on both sides, some of the jury desired leave to retire, and the Judge (without any objection being made by the prisoner or his counsel), put the whole jury in charge of the sheriff, and permitted them to retire together: the jury accordingly retired out of the Court House, in charge and custody of the sheriff. A few minutes afterwards the sheriff returned into the Court House with eleven of the jury only. Thereupon the clerk was directed to call over the names of the jury, when Henry Gorman, the juror whose name was third on the list, did not answer, but in less than two minutes he returned into the Court House, when the Judge expressed strong disapprobation at the juror’s conduct; but upon the juror stating thát he was obliged to step aside to obey the call of nature, and some of the bystanders testifying that the juror was a good well meaning man, and would not knowingly on any consideration have violated any rule of law or of the Court, no punishment was inflicted by the Court. The jury then took their seats in the jury box, and the trial proceeded, without any objection on the part of the prisoner, or his counsel. After argument, the motion for a new trial was overruled. The prisoner’s counsel then offered to prove that while the juror, Henry Gorman, was absent from the body of the jury, he visited the store of W. J. Longee & Co. to get a drink of spirits, which stands at the distance of one hundred, or one hundred and twenty-five yards from the Court House, and in view of it, which the Court refused to receive. The place to which the absent juror went was about seventy or eighty yards from the Court House, but out of the way, and retired.”
It is much to be regretted, that his Honor had not received the proofs offered, and after instituting a full inquiry, caused the precise facts as they might thereon have appeared, to be distinctly put upon record. No one *519 who knows him can for a moment suspect that he intended to deprive the prisoner of the slightest privilege to which he was entitled, or shut him out from any objection which he could urge against the awful sentence about to be pronounced. Individually, I cannot doubt but that he declined to receive the offered proofs, because he considered the fact to be established by them immaterial. Individually, I have little or no doubt of the existence of that fact, but officially, I can notice nothing extrinsic that occurred on the trial as a fact, but what is put on the record as such. I could not even examine the proofs, if the Judge had caused them to be annexed to the record, in order to determine the actual fact. I am bound also to throw out of consideration all that the delinquent juror stated, or his friend declared, to save him from censure. These answered the purpose of screening him from probably well-merited punishment, but it does not follow that they were true, and the record does not find them to be true. No inquiry was made below, how long before the return of the jury into Court, the delinquent juror left his fellows. Their return did but make manifest to the Court the fact of a separation which had previously occurred. Confining,- therefore, my attention strictly to the facts as stated, they are these: —After all the evidence was received, one of the jurors, without permission, went away from the body of the jury, unattended by any officer. How long he was absent, is unknown, except that his absence did not exceed a “ few minutes,” and two minutes thereafter. The place to which he went, the cause of his going off, and the manner in which he conducted himself when away, are also unknown. He returned, and with his fellow jurors, rendered a verdict of guilty, against the prisoner. The question of law, then, is simply this — does an unauthorised and unexplained dispersion of the jury, in a case of life and death, after the evidence is received, vitiate a verdict against the prisoner ? Is such a verdict bad in law 1
Had this verdict occurred forty years ago, about the period when my attention was first directed to legal studies.and legal proceedings, I believe that it would have admitted of very little dispute. The verdict would have *520 been set aside as unquestionably bad. Adjudications however, in England and in our sister states, have since ^een mac^e’ indicating less rigid opinions in relation to the forms of jury trials. These and other causes have concurred to render this question now one of serious difficulty, and impose on me the necessity of re-examining the correctness of the notion which formerly prevailed.
The law of North Carolina is the common and statute law of England, as it existed before the revolution, and has been since modified by state legislation.
It was once the unquestioned law of England, that such a separation of the jury in any case, civil or criminal, vitiated the verdict. Lord Coke lays it down as a fundamental rule, that “ by the law of England, a jury, after the evidence given upon the issue, ought to be kept together in some convenient place, without meat or drink, fire or candle, (which some call an imprisonment,) without speech to any one, unless it be the bailiff, and with him only if they be agreed.” Co. Litt. 227. The severities of this confinement might be mitigated by an order of Court.
The jury might eat and drink in view of the Judge, by order of the Court, says Baron Comyns, title Pleader, Verdict, s. 46, and for this he quotes the Year-book, 20 Hen. 7, 3 p. It is laid down in Doctor and Student, Dialogue 2, ch. 52, page 270, “ with the assent of the Justices, they may both eat and drink.” This part of the rule being intended to guard rather against delay than corruption, was always regarded as not absolutely inflexible, but one which, under the supervision of the Court, might be accommodated to the circumstances of each case. If any of the jury however, without the license of the Court, ate or drank before the verdict was delivered, it was once held that this irregularity vitiated the verdict. But a distinction soon after was taken and recognised as valid; if the jury ate or drank at their own charges, or at the charges of him against whom they found, although they were liable to punishment, this misconduct did not avoid the verdict. 2 Hale’s PI. C. 42. The reason for this distinction is stated in Rogers v. Smith, *521 Palmer, 380, that the misconduct of the juror should be punished, whether it affected the verdict or not, but that it ought not to vacate the verdict, unless it.was of that kind which cast a suspicion thereon. But the first great purpose of this rule, the securing of the jury from the possibility of improper intercourse, forbade all dispensation from that part of it which required confinement. The law had with great pains endeavoured to procure for triers men above all exception, who stood indifferent, as they stood unsworn; and with yet more jealous care provided, that they should hear no evidence but what was relevant to the precise matter in controversy, and fit to bring their understandings and consciences to a prtiper conclusion thereon. If after all these precautionary measures, it permitted the triers to mix with those around them, to catch the partialities and prejudices of the friends and enemies to the parties, and to open their ears to all that might be said in relation to the matter under trial, the precautions were nugatory, and there was no security for an impartial verdict founded upon the evidence. This part of the rule, as it admitted of no dispensation, so it permitted no exception, unless it were such as was produced by imperious necessity, and even this was not allowed without great hesitation, and against the opinion of many of the sages of the law. Brooke’s Abr. Verdict, pi. 19, (of which a correct translation is given in a note I Cow. 252,) states á case between the Bishop of L. and the Earl of Kent, upon the trial of which the jury, after being dispersed by a violent storm, reassembled and returned a verdict. It was finally held, after great debate and much difference of opinion, that because of the necessity, there was no breach of the rule, and the verdict was good. That a separation not caused by necessity vitiates the verdict, appears from the same author, (Verdict, pi. 17,) to have been adjudged in a case of replevin. See also 21 Viner, Trial, ctg. 451 pi. 21. This case so distinctly presents the manner of proceeding upon those irregularities which are not only visited with punishment, but which do away the finding, that it merits attentive consideration.. “Nisi Prius, in replevin, in Essex, the jury was sworn *522 and committed to the ward of the sheriff, and when the Justice would have taken the verdict it was deposed to them by people, that meat and drink was brought to them after their charge, and that they were suffered to go at large, by which the Justices refused to receive their verdict, because it was suspicious; and of this matter complaint was made to the king by bill, who inclosed it to the Justices of B. R. to do right and reason. And the under-sheriff, by his servant, confessed that he permitted them to go at large — and because it appeared of record, viz. his misdemeanor, and he is an officer, a capias was awarded against him — and because the going at large and taking of meat and drink is only surmised, therefore a venire (a summons) was awarded against the jury and the transgressors — and between the parties a new venire facias was awarded, to return twelve,” &c.
In no report of an adjudged case, until the period which shall be hereafter mentioned — in no elementary law writer of acknowledged authority, can I find either decision or dictum, which permits of a further exception. Universal, but in this instance bending to no power but that which all must submit to, it must be taken as one which the law deems essential to the impartial administration of justice. If no judge can dispense with it, certainly no judge can pronounce the violation of it immaterial. The law forbids it in all cases, because it tends to destroy the purity of jury trials. A verdict taken in defiance of this prohibition, is, necessarily, therefore, regarded as “ suspicious,” and unless this suspicion be entirely removed, the verdict seems to me necessarily bad. It cannot be doubted, that whatever might be the rule, more or less rigid, which prevailed, for securing verdicts from this taint of suspicion, it was upheld with much greater jealousy in criminal, and especially in capital, than in civil cases. In the latter, many of the forms of law might be waived — but in the former, the prisoner was understood to waive none to which he had a right. 'His life was at stake. It was put in charge of the jury, and they were to make true deliverance, in respect thereof, between him and the king. In a capital case, there could be no new trial; the verdict of the jury, rendered *523 in due form of law, whether for or against the prisoner, was conclusive as to the claim of the offended sovereign to the life of his subject. In a civil case, there might be a nonsuit; in a criminal case, the jury, onee charged, could not be discharged. In a civil case, and in misdemeanors, the indulgence of a privy verdict was allowed to the jury, but in a capital case, they were bound to look on the prisoner when they pronounced on his deliverance, and freed themselves from their weighty charge. Time, which is a great innovator, and the fashion of this world, which, as it passeth away, leaves not unfrequently lasting changes behind it, may, perhaps, have produed some modifications and alterations in the old rule. I can find, however, no traces of any further alterations or modifications of the rule ever sanctioned by the courts in a capital case. The separation was never allowed, as far as I can see, in any capital case, unless necessity required it; and if so, it must follow, I think, that if it took place against permission, prima facie, it avoided the verdict. The rule as laid down in Lord Delamere’s Case, A Hargrave’s State Trials, 232, was invariably adhered to, and, as far as I can learn, is inflexibly adhered to unto this day. There, on a question whether the court can allow the jury to separate, it was said by all the judges, the jury being once charged, can never be discharged; this is clear, and the reason for that is, for fear of corruption and tampering with the jury. An officer is sworn to keep the jury, without permitting them to separate, or any one to converse with them; for no man knows what may happen; for though the law requires honest men should be returned upon juries; and, without a known objection, they are presumed to be probi et legales homines, yet they are weak men, and, perháps, may be wrought on by undue applications. So Lord Coke, commenting (3 Institutes, ch. 2, s. 15, page 307,) on the trial of peers before the Lord High Steward, says, “ the peers ought to continue together as jurors in case, as other subjects do, until they be agreed of their verdict.” In civil cases, and perhaps in inferior misdemeanors, it seems to have béen early held, that the parties might, by consent, waive such irregularities, if they were not attended, and *524 shown to be not attended, by abuse. Thus it is laid down by Lord Hale, (2 Hale’s P. C. 296,) “ Upon not guilty pleaded, twelve are sworn to try the issue; after their departure, one of the twelve leaves his companions, which, being discovered by the court, by consent off all parties, B. another of the panel, is sworn in the place of A.; and afterwards A. returns to his company; which, being made known to the court, A. is called and examined why he departed; he answered, to drink; and being examined whether he had spoken with the defendant, denied it upon his oath; whereupon B. was discharged from giving any verdict, and the verdict taken of A. and the other eleven, and A. fined for his contempt.” For this he cites 34 Ed. 3, Office de Court, in trespass. I.have not the means of access to the authority which he quotes. It must be understood to have been a case of trespass, by which a capital offence would not have been designated. The defendant, no doubt, desired the absent juror to be reunited with his fellows, for the court required of him to be sworn that he had not spoken with the defendant, and it does not appear to have been objected to on the adverse side. The consent spoken, I understand, therefore, as having extended to all the occurrences on the trial, and the oath of the offending juror removed the suspicion of all tampering and improper communications. Whatever may be the exception which this case seems to make out of the general rule, (and .without violence, it can scarcely be said tp extend further than I have supposed,) it was not regarded by Lord Hale as more than an exception to an established rule, for in the very same page he subjoins, that “ where the jurors depart from the bar, a bailiff ought to be sworn to keep them together, and not to suffer any to speak with them.” The only case in the English books, before our revolution, which I have met with, where a separation not appearing to be by consent, nor justified by necessity, nor shown to be certainly unattended by abuse, is said even in a civil case to uphold a verdict, is that of Lord St. John v. Abbot, reported as of Michaelmas Term, 9 Geo. 2, and to be found in Barnes’s notes, 324. How much reliance is to be placed on this short note of a very inaccurate reporter, it is not *525 necessary now to decide, although for my part, I have no hesitation in declaring, that I would require far more to authorise me in sanctioning any innovation upon previously well settled law. I have far more respect for the opinion expressed by a great American Judge, (the late Mr. Justice Livingston of the Supreme Court of the United States,) and reported in th.e case of Leister v. Stanly, 3 Day, 287. This cause was tried in the Circuit Court of the United States, for the District of Connecticut, where the jurors, by long usage, (denied a part of the common law of that state,) are permitted to go at large. After the case had been committed to the jury, Livingston, Justice, remarked, that he understood it had sometimes been the ' practice with jurors in Connecticut to separate, while they had a case under consideration. He then proceeds thus:— “ The rule of the common law requires them to be kept together until they have agreed on their verdict; and on looking at the statute, we do not perceive that that varies it. If they separate before, and afterwards return a verdict, it will be set aside.” It is true, that in Connecticut, this peculiar practice has been at length sanctioned; (see case of Brandin v. Grannis, 1 Con. Reports, N. S. n. a.), but -it is explicitly settled, because of the long established usage in that state, and it is admitted to be not in conformity with the rule of the common law. There has been no adjudication in North Carolina that I am informed of, which holds such a verdict good. The case of the State v. Carstophen, was quoted at the bar as an authority for that purpose, 2 Hayw. 238. The note is a loose one, and, like many others in that volume, is somewhat inaccurate. My brother Daniel, who was present at the trial, mentions one fact not noticed by the reporter — that the absence of the two jurors was from necessity. Upon the admitted fact of this necessity, and on proof that the jurors had no intercourse with any persons, Judge, Ham, said, the verdict ought not to be set aside, and the motion to do so was not pressed. Without such necessity and such proof, it seems that the verdict would have been deemed invalid. Is this authority ? I recognize if as such, and to its full extent I am willing to go in all cases, civil and criminal. *526 But I want authority, for I cannot find principles to justify me in holding a verdict good, although the jury have gone at large, and the irregularity is pot found or admitted to have been produced by necessity, or to have been attended by no abuse. So far as I have proceeded in this examination, I see no cause to doubt but that in a cáse,of life and death, an unlicensed and unexplained separation of the jury does, in our law, vitiate a verdict against a prisoner, (as unquestionably it once did in the country of our ancestors). One of the duties of judges is to hand down the deposit of the law as they have received it, without addition, diminution or. change. It is a duty, the faithful performance of which is exceedingly difficult. They must refrain from all tempting novelties, listen to no suggestion of expediency, give in to.no plausible theories, and submit to be deemed old fashioned and bigotted formalists, when , all around are running on in the supposed career of liberal improvement. But perhaps there are few duties in which they can so effectually serve the state. A pause is thus created for thought, amid the hurry of action. Stability is given to the public institutions — and, above all, there is that recurrence to fundamental principles, which is enjoined in our constitution, and is essential for the preservation of liberty and order. ,
Questions connected with and thought to bear upon that now under consideration, have been examined and decided in England since our revolution, and recently in our sister states. These decisions are well worthy of attention, not, however, as in the nature of authorities, but .as furnishing evidence of what' learned and wise men have deemed to be the common law of our country as well as of theirs. The case of the King v. Kinnear and Others, 4 Bar. & Ald. 462 — or the King v. Wolfe and Others, as it is entitled I Chitty, 401, (18 Eng. Com. L. Rep. 115,)— is relied on with great emphasis by the state, to show that the irregularity which confessedly existed in the present, case does not avoid the verdict. It is .impossible for any person acquainted with the great talent and probity, which adorn the high judicial tribunals of England, to regard any of their deliberate decisions otherwise than with respect. *527 I have attentively examined this ease, so greatly relied on, but the result of that examination has been, not to shake, but to confirm the opinion which my other researches had produced. It was the case of a misdemeanor. The trial having commenced in the morning, and continued until a late hour in the night, before the evidence even for the prosecution had closed, it became a matter of necessity, that the trial should be adjourned; and by order of the Court, it was so adjourned. The jurors were permitted to retire to their families, after an address from the Chief Justice, warning them to have no communication with any persons touching or concerning the matter in issue. The defendants were convicted. There was no allegation that this warning had been violated, or of any other misconduct in the jury. It was moved to stay the judgment and set aside the verdict, because of this separation ordered by the court. The motion was refused — but let us see upon what grounds. The very first is, that the offence charged was a misdemeanor, and not a capital crime. The Chief Justice Abbott, professedly a profound lawyer, grounds himself upon this alone. After showing that there could be no legal objection, merely because of an adjournment, he adds, “ the adjournment is not necessarily followed by the dispersion of the jury; for in many cases, (and in many cases they ought,) they are kept together until the final close of the trial. But I am of opinion that in the case of a misdemeanor, their dispersion does not vitiate the verdict, and I found my opinion upon the admitted fact, that there are many instances of late years, in which juries, upon trials for misdemeanors, have dispersed and gone to their abodes during the night, for which the adjournment took place; and I consider every instance in which that has beén done, to be proof that it has been lawfully done.” It is not for me to say whether the adjudication was correct or not, but the ground on which the adjudication was placed, militates decidedly, in my opinion, against the purposes for which it is quoted. “ There are cases in which a jury ought to be kept together.” Do we wish to know what are these? They are the cases which, without exception, thev are ordered to be kept *528 together; cases of life and death. In the case of Stone, reported 6 Term Rep. 527, and in those of Hardy, Tooke and others, reported in State Trials, the jury were kept together, notwithstanding repeated adjournments. The law was as rigidly observed in this respect, as it would have been in the days of Lord Coke. The order, after reciting fully the cause which made some intermission in the trial necessary,, proceeded thus: “ It is ordered that the jury empanelled to try the said issue, have leave to withdraw from the bar of this Court, being well and truly kept by six bailiffs, who shall be sworn not to permit any person to speak to them, touching any matter relating to the trial of this issue,, and that the jury shall again come to the bar,” &c. “ There are many instances oflate years,” proceeds the Chief Justice, “ in which juries on trials of misdemeanors, have dispersed and gone to their abodes, during the flight, for which the adjournment took place, and every such instance I regard as proof that if may be lawfully done.” But I believe that I may lay it down as an universal rule, that there is no instance in England, either in ancient or modern times, in which such a dispersion is permitted, on a trial for a capital offence, and for that very reason it follows, that .such 'a dispersion must yet be deemed unlawful. The Chief Justice, having delivered this opinion upon consultation with his associates, I consider what is afterwards added by them, as not constituting the ground of the judgment, but as deserving notice merely because it proceeds from learned men. Justice Bayley remarks, that if a separation for a night will vacate a verdict, why may not one of two minutes ? I confess that I can see no reason why it should not, if each appear to be unlawful, and the possibility of improper communication be not repelled. He says, “ that it is in the experience of persons, that the Judge, as well as the jury, occasionally absent for a short period.” It seems to me there is some confusion here. The question is not of a separation of the Judge from the jury — a separation which the law. does not forbid, but of a separation of the jury from each other, which the law does forbid. Mr. Justice IIolRoyd, places his opinion directly upon this ground. *529 “ I do not find any authority in law, which says that the separation of a jury in a case between party and party, or in the case of a misdemeanor does avoid the verdict.” He adds, indeed, that a separation ought not to take place without the authority of the Court — and if during that separation the jury be guilty of improper conduct they may be fined for a contempt. Mr. Justice Best, after declaring himself of the same opinion with his associates, subjoins some remarks which ■ I feel it incumbent on me to examine a little more particularly. “ It is insisted, says the Judge, that this is a mis verdict, and that no legal verdict has been given. Now, I am alarmed at the extent to which the proposition may be carried, for if this is a mistrial in consequence of the separation of the jury, then if by any accident a juryman gets out of the bar for a single minute, it is a mistrial. Suppose, in the case of a trial for a capital felony, some of the jury by accident get out of the bar, and the prisoner is acquitted, the consequence of this argument would be, that it would be a mistrial, and the man put on his trial- again. That is a consequence which alarms me, and I do not feel that we should give any countenance to an objection that would go to such a mischievous extent.” Whether the argument which the advocate of the prisoner there advanced could be pushed to the mischievous extent which so greatly alarmed the Judge, I am unable to say, but that the doctrine which I take to be the doctrine of the law, ought not tb excite this terror, I have a full conviction. The general; rule is, that a separation avoids the verdict, but that it will not avoid it if caused by necessity, and shown not to have been attended by misconduct. The Judge surely did not mean to be understood literally “ if one of the jurors should happen to get out of the bar.” The law has prescribed no place for the juror’s confinement. The law considers him not separated from his fellows although not in active contact with them, if he be yet under the eye of the Court, or under the charge of its officers — kept from intercourse with the parties to the suit, and others, who not acting under the same sanction which bound the consciences of his fellow jurors, might be tempted to mis *530 lead and pervert him. But again, what does tiie Judge mean by accident 1 If a casualty proceeding from a natural cause, then it presents the acknowledged exception of necessity. But I think it not undeserving of consideration, whether w'ithin the principles of the rule under examination, a separation of the jury, -unless under extraordinary circumstances, can be alleged as a cause of mistrial, on the part of the crown. No doubt, upon a mistrial, the verdict, whether for the Crown, or the prisoner, will be set aside, and a venire de novo awarded. But the same matter of fact cannot be indifferently argued on either side, as cause for avoiding the verdict. If the jury be treated by one of the parties, the other may allege this as cause of mistrial, but he who has caused the irregularity certainly cannot. If the prisoner by any subtle contrivance, produces the separation, and he is acquitted, and there was a possibility of tampering, there ought to be another trial; but if he is wholly guiltless of the separation, it may be doubted whether the crown, which had the unquestioned ability to keep the jury together, and would not, shall be admitted to urge that the dispersion was againts its will. But, however this may be, the true answer to any possible case of oppression, so dreaded by the Judge is, that none such in the history of English criminal trials, has ever yet occurred, although it seems to be distinctly admitted by him, that the law once was as stated by all the Judges in England in Lord Delamere’s case, that a jury once charged, cannot be discharged. And if any alarm should yet remain, it may be allayed by the consideration that if Courts will not relax the rule by which the consequences of separation is to be a mistrial, it may be very confidently expected, that a separation will scarcely ever occur, unless when produced by necessity, or when all parties desire it. The pointed differences between the cases quoted, and that under consideration, are, that was a case of misdemeanor' — this of life and death. The separation there was lawful, because ordered by the Court, in a matter wherein numerous decisions had settled, that such a separation could be rightfully ordered; here it was unlawful because not necessary, *531 and in a case where the court could not order it for any cause short of necessity. A lawful separation, per se, induces no suspicion of improper intercourse with the jury, an unlawful separation does induce the suspicion, else whereupon is it forbidden? A lawful separation inducing of itself no suspicion, must be shown to have been abused before it shall affect the verdict. An unlawful separation must be entirely freed from the taint of suspicion before it can sustain the verdict.
The Attorney-General relies with much confidence on the case of The People v. Douglas, reported 4 Cowen, 26, as supporting the position that the separation does not, per se, vitiate the verdict. If that case is to be regarded as a proper guide to be followed, then it would seém that this verdict ought to have been set aside. If it is not to be followed throughout, it must be because it was incorrectly decided. It merits, therefore, a critical examination before we determine how far it is to be regarded as a safe, and where we shall guard against it as a fallacious guide.
The prisoner had been found guilty of murder, and the sentence respited, that the opinion of the Supreme Court might be had whether the verdict should be set aside. The objections taken to the verdict were, “ that two of the jurors, while out under the care of the constables, separated from their fellows, ate, drank whiskey, put cakes into their pockets, and conversed with bystanders on the subject of the trial.” One of these jurors had become insane, and his affidavit could not be taken. The other denied that he drank whiskey, but did not add, “ nor any other spirituous liquor.” He deposed that he did not converse on the subject of the trial, nor did he believe that the other juror (Lamb) conversed with any one; that he was in his company all the time, except that on his return he left Lamb standing at the door of the jail, where they got cakes, advanced five or six rods before him, turned and called to him, when Lamb immediately followed: and he stated circumstances which strongly negatived the charge that Lamb drank any spirituous liquor. The two jurors implicated were fully proved to be men of very fair characters, and were in no wise affected by any spirituous *532 liquor which they might have drank. All the witnesses who deposed against the conduct of the jurors were contradicted and discredited, with the exception of one only, who said on oath, that he thought he saw them drink some spirituous liquor. The court ordered the verdict to be set aside, and the prisoner to be tried again.
The Judges delivered their opinions seriatim. They all agreed that the mere fact of separation, in a civil cause,, unattended by other abuse, did not avoid the verdict. Assuming this to be the established law in civil cases, they nevertheless guarded against being understood to decide that it would not have this effect, in a capital case. “We do not mean to be understood, that the mere separation of the jury is not sufficient cause for setting aside a verdict,” are the words which the reporter ascribes to.Mr. Justice Woodworth. Perhaps there may be here a misprision of print, and the word “ not” should be expunged. But if so, he' at least means to say, that they leave that point undetermined. “ On so grave a question as that of the life and 'death of a fellow-citizen,” says Chief Justice Savage, “ I am not prepared to say that the separation of the jury, contrary to the instructions of the court, and mingling with the throng about the court-house, should not effect their verdict.” There can be no mistake as to the language. Mr. Justice Sutherland is not quite so definite. His language is, “ I have no hesitation in saying, that when the separation of a jury is contrary to their duty towards the court, and' there is the slightest suspicion of abuse, their verdict should be set aside.” Two of the justices think that the balance of evidence is, that two of the jurors, or one of them at least, did drink spirituous liquor of some kind. One of them thinks that the balance of evidence is against it. They speak of the great difficulty of laying down any general rule, which shall apply to all cases under their various circumstances; but ultimately conclude by establishing as an inflexible rule, that if the jurors drink spirituous liquors, or if, in a case of life and death, it be doubtful whether they may not have drunk some, then without regard to the quantity or the effect produced, the verdict shall not be sustained. In the course *533 of my anxious reflection on the case before us, I have more than once examined the case of The People v. Douglas, and every review has convinced me more and more of the danger of being misled from the straight path of the law by the illusions of opinion. With sincere respect for the learned judges who decided that case, I cannot but say that a legal mind can scarcely fail to discover a repug-nancy between the premises on which they seem to reason and the conclusion to which they are conducted. If there be any general rule on this subject, it must be a rule of law; a rule for the administration of justice, which is to be applied in every case without regard to the particular effect produced thereby, can be nothing less than law. If there be no such rule, whence do the judges derive the power of making one ? If the application is to be regarded as addressed to their discretion, then each case must be judged of according to that discretion applied to its particular circumstances. Yet they ordain that any, the least quantity of spirituous liquors, taken by a juror, shall not be tolerated in any shape, but shall vitiate every verdict, civil or criminal, even when given by consent of parties. And on what is this rule founded, except that the use of spirituous liquors may lead to abuse ? I have no difficulty in saying with my brethren that I can find no law to this effect, and where the law is silent I dare not make a rule by which all in the land are to be governed.
I do not disapprove of the judgment in the case of The People v. Douglas, because the law, which is wiser than any man, has, I think, already laid down the rule which, perhaps, justified the rendering of such a judgment. It has been shown, I think, that the common law would uphold no verdict rendered by a jury who had dispersed without a necessary cause adjudged by the court, or appearing on the record, or in cases short of capital, without permission of the parties; unless, perhaps, where the fact of improper communication is expressly negatived. This rule, venerable from its antiquity, and once admitted to be of undoubted obligation, is founded on the very reasons which induced the judges in New York to establish their rule — because such a separation necessarily leads to abuse, *534 anc{ js impossible to ascertain, in each case, whether actual abuse has followed or not. It is like the rule of evidence which prohibits all testimony from an interested witness, however small his interest. Many witnesses may be thus excluded who would testify truly; but it is impossible to discriminate in each case how far the bias of interest may tempt to the perversion of truth, and to prevent this perversion all such testimony is shut out. If is like the rule in equity which will not tolerate purchases of trustees from those having the beneficial estate, not because there is abuse, but because without the rule there will be abuses winch cannot be detected, and which ought not to be tolerated.
The difficulties in which these learned Judges were involved, I regard as a warning how slight deviations from established rules should ever be permitted. It is manifest, that their embarrassment lay in reconciling certain practices recently tolerated in their state with the law as it unquestionably once stood. It had been held in a civil case, Smith v. Thompson, 1 Cowen, 921, where some of the jurors had eluded the care of the constable, and went off during the night, but returned to the body of the jury next morning, and where no improper communication actually appeared, that as no probability of abuse was seen, they would not set aside the verdict, and this decision was grounded solely on a previous one of Hackly v. Hastie, 3 Johns. 252, in which the common law strictness with respect to the jurors not taking out papers with them, is supposed to have been somewhat relaxed. How easy is the descent, and how hard the return ! The error was, that the Court would not see probability of abuse where the law saw it. Without reversing the case of Smith v. Thompson, they were obliged to hold that the common law rule was done away with in civil cases, and although not prepared to decide that it was abolished also in cases of life and death, they were perplexed with the question, why retain it in part, and not altogether? And now, although they professedly abstain from carrying the innovation to such a dangerous length, their forbearing to stem it, is argued as a reason why we should sanction *535 the innovation, far beyond what they would sanction. As yet, we have no such embarrassments; as yet, we have adhered to the common law rule in all cases, and I think there is nothing so inviting in the experience of those who have departed from it, as should tempt us to follow on in their wanderings. But with deference to the argument deduced for the state from the cases of The King v. Wolfe, and The People v. Douglas, I think it inverts the legitimate order of reasoning. As all human institutions in the progress of time become more or less disordered, so every legal rule, however well defined and clearly established, will be more or less deformed by anomalies, which may gradually be so incorporated into the rule itself, that they cannot be got rid of without violence. It may then be the part of wisdom to bear with them, but for their sake, the rule itself is not to be destroyed. In jurisprudence, as in logic, exceptions prove the rule. If the common law maxim has been so disregarded in civil cases, and in cases of misdemeanor, that it is hopeless to enforce it any longer, and as to them we must abandon law for discretion, let us cherish it with the greater care on those important occasions in which as yet it has been preserved inviolate. As far, then, as I am able to discover, there is no adjudged case in North Carolina, or in England, or in any state of the union, professing to be founded on the common law, which would uphold me in saying, that the irregularities appearing upon this record, showing the possibility of improper communications, and the fact of such communications not negatived, can be disregarded. The irregularities are confessedly against law; they impress on the verdict the stamp of legal suspicion — that impression is not removed: and until it be removed, the law will not found a judgment on what it reprobates and distrusts.
Such would be my conclusion, if I were unsupported by any adjudged cases. But it is a great relief to me to find that I am not. I do not rely as confidently as Mr. Chitty seems to do, (1 Chitty’s Crim. Law, 633,) on the cases of the King v. Fowler, 4 Barn. & Ald. 273, (6 E. C. L. R. 273,) although I think it not unworthy to be cited. The record there was of a conviction in a case of felony, *536 at the Quarter Sessions, whereon the record set*forth, that after a verdict of guilty, “ because it appeared to the said Justices, that after the evidence given on the trial of the said issue had been heard, and after the said jurors had departed from the Court, in order to consider of the verdict to be by them given thereon, and before the delivery of the said verdict into Court, one C. O., a juror, did, without the permission of the said Justices, withdraw and separate himself from the rest of the jurors, and being so separated, did hold conversation with one J. C., the said J. C. not being one of the said jurors, of and concerning the said trial, and concerning the verdict then about to be given therein, therefore it was considered that the verdict given in this behalf was bad and erroneous, and the same was quashed by the judgment of the said Justices, therefore let a new jury come before the Justices, &c.” This is indeed a decision by a respectable Court, — that for the matters therein appearing the verdict is bad — and on being carried before the Court of King’s Bench by error, the decision was not disapproved, but neither was it directly sanctioned. The prisoner having been convicted on the second trial, and judgment being thereon rendered, that Court held that there was no error, for the first verdict was either good or bad — if good, that verdict supported the judgment, and if bad, then the first was a mistrial and a nullity, and the second verdict supported the judgment. Besides, there is a difference between the case referred to and the present; that states an actual conversation of the delinquent juror with a stranger on the subject of the trial, while this leaves the separation open only to the suspicion of such improper communications. But there are decisions of high respectability fully in point.
The case of Commonwealth v. John M'Cawl, decided in the General Court of Virginia, Virginia Cases, 271, (and of which a note is to be found in 1 Cow. 235,) is unquestionably such an one. The prisoner was indicted for grand larceny. The trial continued four days, on each of which the Court adjourned for about two hours, giving orders that in the mean time the jury should be kept together in a room by themselves, where they were *537 allowed refreshments. On their way to the jury room, at the second adjournment, one of the jurors having been unexpectedly sworn on the jury, separated fi;om his fellows about twenty minutes, unattended by any officer. He. ate his dinner at his boarding-house, and returned. Several persons asked' him • if the trial of M‘Cawl was over, to which he answered, that it was not; but he had, as he stated, nd further conversation with any one on the subject, — denied that he had been practised with, and no abuse appeared.- Another was absent a few minutes on a visit to his sick child, (this was in the'morning of the second day,) with an officer, from whom he was separated about five minutes, on going into the room to see his child. Verdict of guilty.
On motion to set aside this verdict, a majority of the Court held, that it must be set aside; that actual tampering with a juryman was not necessary to be shown; that the old rule was, that the jury on no occasion should separate; that this rule is relaxed only in cases of imperious, or perhaps unavoidable' necessity ; that by allowing a verdict to stand when a jury had separated without neces- ■ sity, unless the prisoner, who is in custody of the law, shall show actual tampering or communication with the jury, this great barrier against oppression may be gradually sapped and undermined; that if the court had, without necessity, allowed a juryman to go home without an officer, that would vitiate the verdict; that in a free country, the decision should be on general principles; and that more good would arise from observing the sacred principle involved in the case, than evil from granting a new trial; although in this individual instance, a verdict had probably been given by twelve men, in fact unbiassed by the separation. The verdict was pronounced bad, and a new venire ordered. . Whether the court, which it seems hada right to examine the evidence as to the separation, might not in this case have come to the conclusion, as a fact that it proved there had been no improper communication ; and. upon that fact so established, have upheld the verdict, may admit of a difference of opinion. But supposing that fact not established, the reasons assigned for this decision, *538 (which I have weakened by abridging,) are to me so conclusive, that I content myself by declaring my entire assent to them.
In the case of The People v. M‘Kay, 18 Johns. 212, where the judgment was arrested, and an alias venire ordered, because the venire on which the jury had been returned, was not under seal. Chief Justice Spencer notices a doubt expressed by the prisoner’s counsel, whether arresting the judgment, does not entitle the prisoner to be discharged, without being subjected to another trial. After showing that this will not be the case, he adds, “ a case analogous in principle occurred in Ontario County in 1814. A woman of colour was indicted and tried for murder, and found guilty. The jury had separated after agreeing on a verdict, and before they came into court, and on that ground a new trial was granted, and she was tried again.” Here the separation was after the verdict was agreed upon, which almost excludes the possibility of tampering. But, nevertheless, the verdict was not allowed to stand, because, I presume, the fact of tampering was not actually negatived thereby. To these decisions, let me add some very striking observations of Chief Justice Shaw, in' the case of The Commonwealth v. Roby, 12 Pick. 519, which seem to me strongly to support these conclusions. He quotes the case of M‘Cawl, and then referring to that of Douglas, observes, “ that the court in New York intimated that this, (the decision in M‘Cawl’s case,) went somewhat further than the common law. Whether it would be adopted as the rule here, it is not necessary to inquire. It is manifest that by such separation, the jurors might be thus exposed.” Towards the conclusion of his very able opinion, he adds this remark: “ The result of the authorities is, that where there is any irregularity which may affect the impartiality of the proceedings, as when meat I and drink have been furnished by a party, or where the jury have been exposed to the effect of such influence, as I where they have improperly separated themselves, or have! had communications not authorised; then, inasmuch asl there can be no certainty that the verdict has not been im-1 properly influenced, the proper and appropriate mode oi| *539 correction and relief, is by undoing what is thus improperly, and may be corruptly done — or where the irregularity consists in doing that which may disqualify the jurors for proper deliberation and exercise of their reason and judgment, as where ardent spirits are introduced f there it would be proper to set aside the verdict, because’ no reliance can be placed on its purity and correctness.” If I do not greatly misapprehend the meaning of these,, as I think, most perspicuous observations, the truedistinction is taken, which seems to have been overlooked by the court in The People v. Douglas, For a breach of those positive rules which the law has established,- in order to secure a fair, unbiassed and impartial trial. — among which breaches is an improper separation of the jury — the law furnishes a remedy by undoing, what has been unlawfully, and may have been corruptly done. It annuls and vacates the verdict. As to the mischiefs which result from misconduct of jurors, short of a breach of those positive regulations, made to secure the purity of trial- by jury,, and not appearing to warrant a suspicion of unfairness, the proper remedy to be had is by a new trial- The latter is necessarily a matter of discretion,, but the former is a matter of law.
It is scarcely necessary to remark, that the prisoner is not precluded from insisting on the law, because he did not object to- the juror resuming his place among his fellow jurors. Whatever' might be the effect of this implied assent in a civil ease, in a criminal case, and especially in one where life is at hazard,, the prisoner is to be considered as standing upon all his- rights, and waiving nothing on the score of irregularity. In the view which I am obliged to take of this case, the time of the-juror’s absence cannot affect my judgment. As matter of evidence to the court below, upon an inquiry whether there had been any improper communication, it would have been a material circumstance. The facilities- for improper intercourse may lhave depended much on the length of the-period, during [which the juror was suffered to go at large. But unless Ithe time be so spent that I can judicially say that such Intercourse was impossible, I must adhere to the rule which molds an unexplained separation suspicious.
*540 I See no alternative between a steady adherence to the law, which vitiates a suspected verdict, or leaving the question of its validity or invalidity to depend on the discretion ** *7 x of the presiding judge. To the adoption of the latter branch of the alternative, I have insuperable objections. It would be oppressive to the judge, dangerous to the community, and at variance with the settled principles of our law. It is impossible, indeed, not to confide discretion to judicial magistrates, but I am sure that, while every enlightened friend to free government holds unnecessary discretion to be tyranny, every conscientious judge will say, that of all his duties, none are so distressing as those wherein he can find no certain rule, but is left to his own notions of fitness and expediency. It was remarked by Lord Eldon, that he had often far less difficulty in deciding on the merits of a difficult chancery suit, than in determining on the question of costs; because costs in that court are a matter of discretion. As the exercise of this discretion could not be reexamined, there would be no uniformity of decision. One judge, who had old fashioned notions, would suspect every verdict which the former law of the land held to be suspicious; another less rigid would not indulge this suspicion, unless there was matter shown indicating probable abuse; while a third, yet further advanced in liberal notions, would suspect none, until abuse actually shown. Some would require the jurors to be examined on oath; while others might deem them incompetent on a question as to their own misconduct. Optima est lex quce minimum relinquet arbitrio judiéis, optimus judex qui minimum sibi. The grant of such a discretionary power would be repugnant (so, at least, I think) to the principles of our institutions. When they give a discretion, it is usually, and always ought to be, a discretion of grace and indulgence. I Thus our act of 1815 (Rev. ch. 895,) authorises a judge to I grant a new trial to a defendant convicted of a criminal I charge. It is indeed a mighty power, but it is a power I only to do mercy. The prisoner has been tried according I to the forms of law, has had the full exercise of every legal I privilege — has been convicted regularly by the appropriate! tribunal, and can complain of the withholding of no right, 1 *541 if the judge declines to interfere between him and the sentence of the law. But to vest the judge with the irresponsible and uncontrollable power to dispense with positive legal requirements, intended to secure the upright administration of justice, and to decree when their nonobservance should, and when it should not, invalidate what was done in contempt of them — ought not to be, under a government of laws.
The trial by jury, justly considered as the strongest security to the liberties of the people which human sagacity ever devised, as well as the happiest contrivance for cherishing among all an affectionate attachment to the laws, in the administration of which they act so important a part — must be kept under the protection of law, and not left under the patronage of its minister's. If the old rule be disregarded, new ones must be devised. To proceed wholly without rule would be intolerable, and the courts, for their own convenience, as well as for the public order, would be obliged, as it seems that the judges in New York have done, to make rules. With the most sincere deference for the opinion of my brethren — for as none know them better, none can respect their advised judgment more than myself. I do believe that we have such a rule already, “ not the product of the wisdom of some one man, or society of men, in any age, but of the wisdom, counsel and observation of many ages of wise and observing men” — that this rule declares a verdict rendered by jurors who have gone at large suspicious — and requires of its ministers, unless it is seen that, in fact, there could not be the tampering, or improper communication, which the law suspects, to pronounce it bad.
Per Curiam. Judgment affirmed.